UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
:
REGINALD LAUGHLIN, :
: CASE NO. 1:14-CV-01772
Plaintiff, :
:
v. : OPINION & ORDER
: [Resolving Doc. 17]
CITY OF CLEVELAND, ET AL., :
:
Defendants. :
:
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiff Reginald Laughlin alleges that Defendant City of Cleveland, his former employer, illegally fired him in retaliation for complaining about racially and sexually harassing comments made by his foreman, Defendant Dominic Santora. Defendants now move for summary judgment.[1] Defendants argue that Santora's comments do not constitute discriminatory harassment, and thus Laughlin fails to state a claim for illegal retaliation because any complaints Laughlin made would not have been about an unlawful employment practice. In the alternative, Defendants say that even if Santora's comments rose to the level of harassment, the firing was justified by Laughlin's bad performance reviews.

For the reasons below, the Court **GRANTS** Defendants' motion for summary judgment.

### I. Background

Defendant City of Cleveland hired Plaintiff Laughlin, an African American, in October 2012

---

[1] Doc. 17. Laughlin opposes. Doc. 18. Defendants have replied. Doc. 19.

Case No. 1:14-CV-01772
Gwin, J.

as a sewer service worker with the City's Department of Public Utilities.[2] In this position, Laughlin was part of crews that would repair sewer lines. As a new employee, he was subject to a 180-day probationary period.[3] During this time, he was to be given a written performance review every 30 days.[4] The City had the power to fire Laughlin during the probationary period if his performance reviews were unsatisfactory.[5]

In the slightly more than three months Laughlin worked for the City, he worked on three different work crews run by three different foremen.[6] Laughlin's complaints in this action relate to his time spent on the second of these crews, which had as its foreman Defendant Dominic Santora.

Laughlin alleges that Santora "regularly" made comments about young black women the crew saw while working.[7] Santora's comments were not overtly racial, instead they were sexist, such as "look at the ass on that bitch," and "look at the titties on that bitch."[8] But Laughlin also says that Santora only made these comments about black women; he says Santora did not make these inappropriate comments about white women.[9] As a result, Laughlin found the comments to be racially offensive.

Santora admits that he would "point out" or comment on "nice-looking lad[ies] walking

---

[2] Doc. 17-6 at 40–41.
[3] *Id.* at 54.
[4] *Id.*
[5] *Id.*
[6] Rotating between crews likes this was standard operating procedure: new employees would periodically move between crews to ensure they were learning necessary skills and to "determine the best fit." Doc. 17-2 at 20; Doc. 18-3 at 3.
[7] Doc. 17-2 at 25.
[8] *Id.* at 24–25.
[9] *Id.* at 24.

-2-

Case No. 1:14-CV-01772
Gwin, J.

down the street," but denies singling out black women.[10] Santora did not make racist or sexist comments about City employees. And Santora never made any inappropriate personal racial comments to Laughlin.[11]

Plaintiff Laughlin says he twice spoke to Santora about these comments and asked him to stop.[12] Laughlin also complained to Maintenance Supervisor Michael Smith, Santora's supervisor.[13] Smith first advised Laughlin to talk to Santora about the problem.[14] When this did not satisfy Laughlin, Smith directed Laughlin to Sewer Maintenance Superintendent Daniel Tomko so that Laughlin could file a written report.[15]

On December 27, 2012, Laughlin spoke to Superintendent Tomko. Tomko gave Laughlin an incident complaint report form to fill out. Laughlin completed the form,[16] but on the advice of his union representative decided not to file any written complaint until he had completed his 180-day probationary period.[17] Superintendent Tomko has consistently denied that he knew the exact nature of Laughlin's complaints. Laughlin "refused to tell [Tomko] what his complaint was, and [Tomko] did instruct [Laughlin], 'You don't have to tell me but here's some paperwork to fill out and I can walk you over to human resources when you are ready and we'll turn it in,' and [Laughlin] never

---

[10] Doc. 17-3 at 28–29.

[11] Id. at 25; Doc. 17-2 at 25 (Laughlin described Santora berating him by saying to "get on the fucking truck," but admitted that Santora did not make any inappropriate racial comments "directly" to Laughlin.).

[12] Doc. 17-2 at 27–28.

[13] Id. at 26–27; Doc. 17-6 at 68.

[14] Doc. 17-2 at 27.

[15] Id. at 26, 29.

[16] Doc. 17-6 at 71–74.

[17] Doc. 17-2 at 31–32; Doc. 17-6 at 70.

Case No. 1:14-CV-01772
Gwin, J.

down the street," but denies singling out black women.[10] Santora did not make racist or sexist comments about City employees. And Santora never made any inappropriate personal racial comments to Laughlin.[11]

Plaintiff Laughlin says he twice spoke to Santora about these comments and asked him to stop.[12] Laughlin also complained to Maintenance Supervisor Michael Smith, Santora's supervisor.[13] Smith first advised Laughlin to talk to Santora about the problem.[14] When this did not satisfy Laughlin, Smith directed Laughlin to Sewer Maintenance Superintendent Daniel Tomko so that Laughlin could file a written report.[15]

On December 27, 2012, Laughlin spoke to Superintendent Tomko. Tomko gave Laughlin an incident complaint report form to fill out. Laughlin completed the form,[16] but on the advice of his union representative decided not to file any written complaint until he had completed his 180-day probationary period.[17] Superintendent Tomko has consistently denied that he knew the exact nature of Laughlin's complaints. Laughlin "refused to tell [Tomko] what his complaint was, and [Tomko] did instruct [Laughlin], 'You don't have to tell me but here's some paperwork to fill out and I can walk you over to human resources when you are ready and we'll turn it in,' and [Laughlin] never

---

[10] Doc. 17-3 at 28–29.

[11] Id. at 25; Doc. 17-2 at 25 (Laughlin described Santora berating him by saying to "get on the fucking truck," but admitted that Santora did not make any inappropriate racial comments "directly" to Laughlin.).

[12] Doc. 17-2 at 27–28.

[13] Id. at 26–27; Doc. 17-6 at 68.

[14] Doc. 17-2 at 27.

[15] Id. at 26, 29.

[16] Doc. 17-6 at 71–74.

[17] Doc. 17-2 at 31–32; Doc. 17-6 at 70.

Case No. 1:14-CV-01772
Gwin, J.

came back."[18]

On December 28, 2012, the day after he spoke to Tomko, Laughlin was transferred to a different crew run by foreman Phillip Lewis,[19] possibly as a result of Laughlin's meeting with Tomko.[20] Laughlin worked with that crew for about a month, until he was terminated.

On January 31, 2013, the City fired Laughlin, finding his work during the first 90 days of his 180 day probationary period to have been "unsatisfactory."[21] The decision was made by the Commissioner of the Division of Water Pollution Control and communicated to Laughlin by Danyelle Conner, a human resources manager.[22] The termination letter from the Commissioner explains that Laughlin had not made adequate "progress [in his] work performance," as his "skill level d[id] not meet the standard of work performance desired for [his] position . . . ."[23]

By the time he was fired, Laughlin's had received three written performance reviews. These reviews explain the Commissioner's negative view of Laughlin's work. The first review rated him as an average worker who was "continu[ing] to get a better understanding of the job."[24] The second review, however, rated him as thoroughly below average because he "wasn't retaining the knowledge needed to perform job duties."[25] The third review reached the same conclusion as the second: Laughlin was a below average worker who did not demonstrate the skills expected by someone with

---

[18] Doc. 17-1 at 22–23.
[19] Doc. 17-2 at 32; Doc. 17-6 at 36, 68.
[20] *See* Doc. 17-2 at 32;
[21] Doc. 17-6 at 37.
[22] *See id.*; Doc. 17-4 at 19.
[23] Doc. 17-6 at 37.
[24] *Id.* at 1.
[25] *Id.* at 3.

Case No. 1:14-CV-01772
Gwin, J.

his experience.[26] Both the first and second evaluations were completed by Defendant Santora; the third evaluation was completed by foreman Lewis.

At the meeting where he was terminated, Laughlin stated that he felt the firing was in retaliation for complaining about Santora.[27] Although Conner had previously not been aware of Santora's complaints, after the meeting Conner conducted an investigation into Laughlin's allegations of racial and sexual harassment.[28] She ultimately wrote a report concluding that no illegal harassment had occurred.[29] She testifies that the same decision to fire Laughlin would have been made even if the City had been aware of his complaints.[30]

After receiving a right to sue letter from the EEOC,[31] Laughlin initiated this action.

## II. Legal Standards

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[32] The moving party must first demonstrate that there is an absence of a genuine dispute as to a material fact entitling it to judgment.[33] Once the moving party has done so, the non-moving party must set forth specific facts in the record—not its allegations or denials in pleadings—showing a triable issue.[34] The existence of some doubt as to the material facts is insufficient to defeat a motion for

---

[26] *See id.* at 5–6 ("Employee needs to show what he knows [and] can do.").
[27] Doc. 17-2 at 13; Doc. 17-4 at 21–22.
[28] Doc. 17-4 at 23–26.
[29] Doc. 17-6 at 68–70.
[30] *See* Doc. 17-4 at 23.
[31] Doc. 1-2 at 10.
[32] *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 580 (6th Cir. 2014) (quoting Fed. R. Civ. Pro. 56(a)).
[33] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[34] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Case No. 1:14-CV-01772
Gwin, J.

summary judgment.[35] But the Court views the facts and all reasonable inferences from those facts in favor of the non-moving party.[36]

Title VII prohibits an employer from "discriminat[ing] against any individual . . . because he has opposed any . . . unlawful employment practice,"[37] including discrimination based on race or sex.[38] Similarly, under Ohio's anti-discrimination statute, Ohio Revised Code § 4112, it is illegal "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice,"[39] including employment discrimination on the basis of race or sex.[40] Federal case law under Title VII is also generally applicable to cases involving Ohio employment discrimination law.[41]

### III. Analysis

Laughlin's claim boils down to this argument: Santora created a hostile work environment by making racist and sexist comments, and when Laughlin complained about it, Santora gave him negative performance reviews and the City fired him in retaliation. Both Title VII and Ohio law use a burden-shifting framework to analyze retaliation claims that rely on circumstantial rather than direct evidence.[42] In the initial stage, the plaintiff must put forward a prima facie case of retaliation, which has four elements. The first element is that the defendant engaged in protected activity. The

---

[35]*Id.* at 586.
[36]*Killion*, 761 F.3d at 580. (internal citation omitted).
[37]42 U.S.C. § 2000e-3(a).
[38]42 U.S.C. § 2000e-2(a)(1).
[39]Ohio Rev. Code § 4112.02(I).
[40]*See id.* § 4112.02(A).
[41]*See Genaro v. Cent. Transp., Inc.*, 703 N.E.2d 782, 786 (Ohio 1999).
[42]*See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)); *Smith v. Dep't of Pub. Safety*, 997 N.E.2d 597, 611-12 (Ohio Ct. App. 2013).

-6-

Case No. 1:14-CV-01772
Gwin, J.

second is that the employer was aware of the protected activity. The third is that the employer took an adverse action against the employee.[43] And the fourth is that there is a causal connection between the protected activity and the adverse action.

If the plaintiff makes out his prima facie case, the defendant then has the burden of producing a legitimate nondiscriminatory reason for the action it took. If the defendant meets this burden, the burden shifts back to the plaintiff to demonstrate both that the asserted reason is pretextual and that retaliation was the real reason for the action.

According to Defendants, Laughlin cannot even make out a prima facie case.[44] First, they say a hostile work environment requires abusive conduct targeted at the plaintiff. Because Santora did not make racist or sexist comments about Laughlin, Defendants say Laughlin did not suffer discrimination and thus any complaints he made were not protected activity. Second, they say that even if Laughlin's complaints were protected activity, they were not the reason he was fired and thus there is no causation.

**A. Protected Activity**

A successful hostile work environment claim requires the plaintiff show "conduct [that is] severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive."[45] To do so, the

---

[43] Defendants have not challenged that Laughlin experienced an "adverse action."

[44] Neither party has addressed the second and third stages of the burden-shifting framework applicable to this case. Instead, they focus only on Laughlin's ability to make out a prima facie case. As such, any arguments related to these issues have been forfeited, and the Court will also focus its attention only on the prima facie case. But since Laughlin fails to make out a prima facie case, the Court would not have had to reach the second and third stages anyway.

[45] *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000); *see also Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65–66 (1986). "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002).

Case No. 1:14-CV-01772
Gwin, J.

plaintiff must "prove that a reasonable person subjected to the discriminatory conduct would find . . . that the harassment so altered working conditions as to make it more difficult to do the job."[46] This requires "careful consideration of the social context in which particular behavior occurs."[47]

Defendants argue that Laughlin could not have experienced a hostile work environment because Santora's remarks were about black women on the street, rather than about Laughlin or his co-workers. The case Defendants primarily rely on is inapposite. The plaintiff police officers in *Wimmer v. Suffolk County Police Department* overheard their co-workers make racist remarks to citizens.[48] The court found that because the racist comments were not directed against the plaintiffs or their co-workers, but rather at members of the public, there had been no discrimination in the work environment and thus no violation of Title VII. Here, by contrast, Santora's comments were not directed at the black women he was ogling, but rather *at Laughlin and his co-workers*. True, those remarks were not directly disparaging Laughlin or his co-workers. But taken in the light most favorable to Plaintiff, they could reasonably have been perceived as racist and/or sexist, and although they were made *about* non-co-workers, they were made *to* Laughlin.

Still, it is unlikely that Laughlin was actually subjected to an actionable hostile work environment, even though he was the recipient of sexist, and potentially racist, remarks. While Santora's comments were inappropriate and offensive, they do not seem to have affected the workplace to such a degree that a reasonable person would have found it more difficult to do

---

[46] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 26 (1993) (Ginsburg, J., concurring) (internal quotation marks, alteration, and citation omitted).
[47] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).
[48] 176 F.3d 125 (2d Cir. 1999).

-8-

Case No. 1:14-CV-01772
Gwin, J.

Laughlin's job. "Title VII is not a 'general civility code,' and thus conduct is not illegal just because it is uncomfortable, or inappropriate."[49] While Santora's comments are undoubtedly inappropriate, demeaning to women (particularly black women), and deserving of punishment by his employer, they likely do not rise to the level of employment discrimination on the basis or race or sex. Although they persisted over a period of several weeks, they appear to be more akin to offhand jokes and comments that—while lamentable—are not sufficiently abusive to make out a hostile work environment claim.[50]

But that does not end this action—that Laughlin did not actually experience a hostile work environment does not mean his retaliation claim must fail. "Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII."[51] Thus, "a violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful."[52] What matters is whether Laughlin "could have had a reasonable, good faith belief that he was" subject to a hostile work environment.[53] This standard contains both an objective and a subjective component: Laughlin must have subjectively believed that he was experiencing a hostile work environment, and his belief

---

[49] EEOC Compliance Manual on Race and Color Discrimination, at 15-36 (2006), *available at* www.eeoc.gov/policy/docs/race-color.pdf (citing *Oncale*, 523 U.S. at 80–81).

[50] *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). After reviewing Laughlin's complaints during herdeposition , the City's Human Resources Director, Deborah Southerington, also concluded that this conduct did not rise to the level of an actionable hostile work environment and that her office would not have been obligated to even investigate these complaints. *See* Doc. 17-5 at 24.

[51] *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).

[52] *Id.*

[53] *See Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 469 (6th Cir. 2012).

-9-

Case No. 1:14-CV-01772
Gwin, J.

needs to have been objectively reasonable given the facts and circumstances.[54]

Laughlin was obviously offended by Santora's comments. Laughlin "let [Santora] know the stuff [Santora] was saying" made Laughlin "uncomfortable with the way [Santora] was saying things and what [Santora] was saying."[55] After receiving Laughlin's complaint about his conduct, Laughlin testifies: "The first time he [Santora] seemed like he was concerned about it, he was like, you know, he was open to changing the things he was doing. The second time he just didn't give a shit, you know, like, 'I don't care what you are saying,' this and that, 'This is how I am. This is my truck.' Basically saying that, 'I'm going to do what I want to do.'"[56] That is potentially enough for Laughlin to feel abused and to have complained about potential discrimination in good faith, even if someone reviewing the situation would have ultimately concluded that no actionable discrimination had occurred.[57]

But even though Laughlin complained in good faith, only reasonable complaints are considered "protected activity." While employees should be encouraged to report this sort of boorish behavior to their superiors, they are not immediately protected from any adverse employment action whenever they complain about their co-workers. Although this is a close case, the Court concludes that it was objectively unreasonable for Laughlin to believe that Defendant Santora's remarks constituted illegal discrimination. Laughlin is not held to know exactly what would or would not

---

[54] *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999); *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).
[55] Doc. 17-2 at 17–28.
[56] *Id.* at 28.
[57] *See Wasek*, 682 F.3d at 470.

Case No. 1:14-CV-01772
Gwin, J.

constitute discrimination under the law.[58] But overall, there is insufficient evidence for the Court to find that Laughlin could have reasonably believed he had a claim. Laughlin has put forth only vague assertions that Santora made these comments "regularly;" he has given no other indication about their frequency. And even though Santora's comments were inappropriate and made Laughlin uncomfortable, what Laughlin describes was not nearly severe enough to have "permeated [the workplace] with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [Laughlin's] employment."[59]

Because Laughlin has not established that he engaged in protected activity, his claim fails. As explained in the next section, however, even if Laughlin's complaints did constitute protected activity, they were not the but-for cause of his termination.

### B. Causation

Defendants also argue that even if Laughlin engaged in protected activity by complaining about discrimination, it was not the reason he was given bad reviews or fired. They say he was simply an inadequate worker. The evidence supports Defendants' position.

To make out a prima facie case of retaliation, the plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."[60] Under this but-for test, if the adverse action was based on both legitimate and

---

[58]/*Cf., e.g.*, *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 656 (6th Cir. 2012) ("A reasonable person in [the plaintiff's] position, particularly one without legal training, could conclude that [his manager's] comments constituted hostile environment discrimination in violation of Title VII." (emphasis added)).

[59]/*See Harris*, 510 U.S. at 21.

[60]/*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Case No. 1:14-CV-01772
Gwin, J.

illegitimate factors, the plaintiff's claim fails for lack of causation.[61] Similarly, "[w]hen an adverse decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, . . . the employer may be held liable under a 'rubber stamp' or 'cat's paw' theory of liability."[62] This requires showing "that the decisionmaker relied on the discriminatory information from the biased supervisor. . . . If the wrongful actions were merely a motivating factor in the termination decision, the claim fails as a matter of law."[63] Thus, as long as Santora had a legitimate basis for giving Laughlin a bad review and the City had a legitimate reason for terminating Laughlin, Laughlin loses.

The City relied on Laughlin's bad performance reviews in making the decision to terminate him. Superintendent Tomko also recommended, based on the second performance evaluation and the related recommendation of Maintenance Supervisor Smith, that the Commissioner fire Laughlin.[64]

Defendant Santora wrote Laughlin's second, and most negative, performance review around December 14, 2012, about two weeks before Laughlin approached Superintendent Tomko about filing a written complaint against Santora. In that review, Santora gave Laughlin uniformly bad scores, concluding that Laughlin "wasn't retaining the knowledge needed to perform job duties," "always walked away [from] difficult tasks," and "was not open to constructive criticism."[65] Laughlin says this review contains "misrepresentations and half truths" that were made for the

---

[61] *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 428–29 (6th Cir. 2014) (citing *Nassar*, 133 S. Ct. 2517).

[62] *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 586 (6th Cir. 2014) (quoting *Bishop v. Ohio Dep't of Rehab. and Corr.*, 529 F. App'x 685, 696 (6th Cir. 2013)) (quotation marks and internal alterations omitted).

[63] *Id.* (citations omitted).

[64] Doc. 17-1 at 21–22, 33–35.

[65] Doc. 17-6 at 2–3.

Case No. 1:14-CV-01772
Gwin, J.

purpose of getting him fired.[66/]

Laughlin also points to an incident report Santora wrote on December 27, 2012, as evidence that Santora retaliated against Laughlin.[67/] Santora generally complained that Laughlin had been insubordinate, wandered off a job site, and ignored Santora's instructions. Santora wrote this report the same day that Laughlin spoke to Superintendent Tomko about filing a written complaint against Santora. Laughlin does not allege that this incident report itself constitutes an adverse action. Rather, he says it shows that Santora was trying to get Laughlin fired.

But when this second performance review is viewed in conjunction with the first and third, it supports the City's argument that it fired Laughlin because of his poor work rather than for an impermissible retaliatory reason. At the time Defendant Santora completed the first performance review, Laughlin had only been working on Santora's crew for a few days.[68/] Santora gave Laughlin average scores, concluding that Laughlin was "doing very well," but cautioning that Laughlin would "need to continue learning the job."[69/]

Laughlin's third performance review, completed by foreman Phillip Lewis after Laughlin had been on his crew for about a week, also describes Laughlin as a below-average worker. Lewis ranked Laughlin's performance to be unsatisfactory in three of six categories, including job knowledge, motivation, and quality of work.[70/] Lewis also ranked Laughlin below average for company relatedness, operating judgment, and leadership. Lewis gave Laughlin no average or above average ratings. Lewis had no knowledge that Laughlin had complained about Santora's comments,

---

[66/]*See* Doc. 18 at 20.
[67/]Doc. 17-6 at 33–34.
[68/]Doc. 17-3 at 18; Doc. 17-6 at 70.
[69/]Doc. 17-6 at 1–2.
[70/]*Id.* at 5–6.

Case No. 1:14-CV-01772
Gwin, J.

and Laughlin does not allege that Lewis acted with discriminatory intent in writing the review.[71]

These performance reviews fit into a broader narrative of Laughlin as someone who started out well enough, but simply did not improve as much as needed to justify keeping him as an employee. The statements of Laughlin's co-workers that were obtained during the post-termination investigation also support this. Stephen Skapura, a sewer service worker on Defendant Santora's crew, said that he "tried to show [Laughlin] some things, but [Laughlin] did not appear motivated."[72] Ted Arensberg and Maurice Grayer, two sewer service workers on foreman Lewis's crew, stated that Laughlin was "a little slow" and "clueless" when he joined their crew.[73] They say he improved while working with them, but only because they took more time to work with him than other crews would have.[74]

Although the Court must take all reasonable inferences in favor of the non-moving party, the evidence does not permit the inference that impermissible retaliation was the sole motivating factor in the City's decision to fire Laughlin. Foreman Lewis's performance review is highly probative, as it shows that Laughlin had not adequately progressed in his job performance to merit continued employment. The City thus had a legitimate reason for firing Laughlin, based on his failure to learn the skills necessary for the job.

Similarly, even if there were some retaliatory motive for Santora's second review, that is not enough for Laughlin to win. No reasonable jury could say that retaliation was the sole, but-for cause of the bad review. Laughlin's poor work—as described by foreman Lewis and Laughlin's co-

---

[71] *Cf.* Doc. 17-3 at 56–58 (Santora described having had only a few social interactions with Lewis).
[72] Doc. 17-6 at 69.
[73] *Id.*
[74] *See id.*

-14-

Case No. 1:14-CV-01772
Gwin, J.

workers—was an adequate and legitimate reason for the bad review. And to the extent that the City's decision to fire Laughlin flowed from the bad review, again, it would have been based at least in part on the City's legitimate concerns about Laughlin's poor work.

Laughlin has therefore failed to show that there is a genuine issue of material fact that retaliation for engaging in protected activity was the sole, but-for cause of the adverse actions he experienced, and his prima facie case fails.

### IV. Conclusion

For the reasons above, the Court **GRANTS** Defendants' motion for summary judgment.

IT IS SO ORDERED.


Dated: April 7, 2015                                s/    *James S. Gwin*
                                                                     JAMES S. GWIN
                                                                     UNITED STATES DISTRICT JUDGE